IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

William M. Abrams, et al.,          :
                                    :   Case Number: 1:07-cv-181
            Plaintiffs,             :
                                    :   Chief Judge Susan J. Dlott
      v.                            :
                                    :   ORDER GRANTING IN PART
United Steel Workers of America,    :   AND DENYING IN PART
AFL-CIO-CLC, et al.,                :   MOTION FOR SUMMARY JUDGMENT
                                    :
            Defendants.             :


      This matter is before the Court on Defendants' Motion to Dismiss and for Summary

Judgment Addressing the Six-Month Limitations Period (doc. 21). Plaintiffs are 124 individuals

who, until their employment was terminated, were employed by Cognis Corporation ("Cognis")

at its plant in Cincinnati, Ohio, and were represented for collective bargaining purposes by

Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union, AFL-CIO-CLC ("USW")[1] through its Local Union

14340 (collectively "the Union"). Plaintiffs claim that the Union violated its duty to fairly

represent all of its members, including Plaintiffs, during the course of a labor strike at Cognis

that began on February 7, 2005 and continued until December 2006 when the USW terminated

its strike assistance and Local 14340 dissolved. Plaintiffs filed this lawsuit on March 6, 2007.

Defendants seek dismissal of Plaintiffs' suit on grounds that the suit is barred by the six-month

limitations period governing Plaintiffs' breach of the duty of fair representation claim. For the

following reasons, Defendants' motion is GRANTED as to Plaintiff James Logan and DENIED

as to the other 123 Plaintiffs.

---

[1] Defendants were incorrectly named in the Complaint as the United Steelworkers of
America, AFL-CIO-CLC and Local 14340.

## BACKGROUND[2]

USW, Local 14340, and Cognis were parties to a collective bargaining agreement ("CBA") governing a unit of approximately 270 production and maintenance workers in Cincinnati, Ohio. The CBA expired on February 7, 2005. In late January 2005, Cognis announced that in the first half of 2005 it would "carve out" certain manufacturing activities into a separate legal entity. Because this affected approximately 200 of the unit's 270 members, the Union made a "successorship" proposal to Cognis that would have required a buyer of any portion of the plant to recognize the Union as the bargaining representative for the employees working at the plant and to agree to assume the current collective bargaining agreement or enter into a new agreement with the Union. (Doc. 29 Ex. 11 (Union Proposal Feb. 4, 2005.)) Cognis did not accept that proposal. On February 4, 2005, Cognis presented the Union with a "Last, Best, Final Complete Proposal For A New Labor Agreement" that did not include the proposed successorship language.

Local 14340 held a membership meeting on February 5, 2005 to vote on Cognis' offer. The Local bargaining committee recommended a strike. Defendants claim that the principal disputes related to job security language and Cognis' proposed two-tier wage system; Plaintiffs claim the key issue for striking that the Union leaders advocated to the members was their insistence on strong successorship language. (Doc. 28 ¶ 2.) Regardless, the meeting minutes demonstrate that USW representative Dave McLean told members that "all economic issues were T.A. [tentatively agreed], and that if we strike it would be a non economical [sic] strike." (Doc. 29 Ex. 17.) By secret ballot, Local 14340 members voted "224 to 23" to reject Cognis'

---

[2] Unless otherwise indicated, background facts are drawn from Defendants' Proposed Undisputed Facts (doc. 19) to the extent they are admitted by Plaintiffs (doc. 28). Defendants' motion is grounded primarily on uncontested documents and the testimony of Plaintiffs, including five representative "core" Plaintiffs selected by Plaintiffs' counsel: Jeffrey Meeks, Gary Meeks, Scott Kennedy, Joe Mitchell, and Robert Weisbrodt.

offer and to strike.

The strike began on February 7, 2005.  In a February 7, 2005 letter to the Union, Cognis referred to the "economic strike you are engaged in" and warned "we will explore all our options for continued operations, including hiring replacement persons."  On February 20, 2005, Cognis began advertising "immediate full time openings."  Local 14340 set up pickets outside the hotel where Cognis was interviewing replacement workers.  By April, Cognis had hired 158 permanent replacements.  Plaintiffs claim that although they became aware that Cognis was hiring replacement workers in February and March of 2005, the Union represented to Plaintiffs that these replacements were "temporary."  (Doc. 28 ¶ 3.)  The Plaintiffs state that they believed they were "non-economic" strikers who could not be permanently replaced based on what the Union told them.

During the week of February 28, striker Joe Collins, who is not a Plaintiff in this action, concluded that the Union was not fairly representing the membership.  Collins and two other strikers, including Plaintiff Logan, consulted the Cincinnati National Labor Relations Board ("NLRB") office seeking information about whether the strikers could be permanently replaced.  They spoke to an NLRB lawyer who told them that job security was an economic issue and that the Cognis strikers could be permanently replaced.  This was "totally inconsistent" with what the union leaders had said.  Logan told approximately ten more strikers about what he had learned at the NLRB.

In March 2005, Collins and another striker consulted private lawyers about bringing charges against the Union for breach of duty of fair representation because the union was saying that the strike was "non-economic."  These lawyers, like the NLRB, said the strike was an economic strike.  Plaintiff Mitchell heard that Collins had hired an attorney and was trying to sue the Union.  Collins then invited strikers to meet at a Spring Grove Avenue lot on March 25, 2005

to discuss the NLRB information.  On that day, Collins spoke to strikers and circulated a petition that read in part:

> In light of new evidence which has recently arose from the National Labor Relations Board stating that there are only two types of strikes, economic and unfair labor practice, [which] clearly contradicts [Local 14340 president] Mike Eggie statements made in our Contract Ratification Meetings of February 5, 2005 saying we are going to be on a non-economic strike and cannot be permanently replaced, [made] in the presence of Dave McLean International Representative.
>
> We the members of Local 14340 United Steelworkers of America demand that a special meeting be convene[d] urgently to discuss the aforementioned along with recognizing our members['] rights to reconsider the Company['s] Last, Best and Final Offer that is currently on the table so the democratic process can continue.

Doc. 21 Ex. 10.  Collins needed ten signatures to call a special meeting of the Local.  Twenty-four strikers signed this petition, four of whom are Plaintiffs in this lawsuit (James Logan, Thomas Arns, Chester Sadler, and Ronald Nichols).  Arns testified that he went to the Spring Grove meeting because he wanted to get his job back; he hoped that they could reopen discussions about the contract and demand another vote.  (Thomas Arns dep. 17.)[3]  Arns testified that at the time he signed the petition, he had suspicions that Eggie had been lying to the membership.  (*Id*. at 73.)  However, Arns did not cross the picket line.  (*Id*. at 22.)[4]

Collins mailed the petition to the Local, and the Local mailed a March 31, 2005 notice to the membership that a special meeting would be held on April 6 immediately following the regular membership meeting.  The notice reported that the agenda was "to discuss new evidence supposedly obtained from the National Labor Relations Board regarding the status of our Strike"

---

[3]  Excerpts of the deposition transcript of Thomas Arns are filed at Doc. 18 Ex. 54.

[4]  Arns testified that although he was getting conflicting information from the company and from Eggie, he relied on Eggie: "Q. Did you think the company's telling me it's an economic strike and I don't know who to believe, is Eggie pulling something over on me?  A. That's about when I started thinking that, *but then again, he was my representative*."  (*Id*. at 42 (emphasis added).)

and to "reconsider" Cognis' "Last, Best and Final Offer."

At the regular meeting convened on April 6, 2005, union lawyer Thomas Kircher spoke to the members. According to Defendants, Kircher gave an overview of the National Labor Relations Act ("NLRA"), explained economic and unfair labor practice ("ULP") strikes and permanent replacement, and reviewed the union ULP charges against Cognis. (Doc. 19 ¶ 11.) Plaintiffs deny that Kircher informed them they were in an economic strike and could be permanently replaced. (Doc. 28 ¶ 11.) In fact, many of the Plaintiffs testified that Kircher informed the membership that they were in a "non-economic strike" and did not say anything about it being an unfair labor practice. (*Id*.) At the same meeting, "Mike Eggie said that we still feel this is a non-economical strike," as recorded in the official and alter approved minutes of the meeting. (Doc. 29 Ex. 27.)

Immediately after the regular meeting, Eggie convened the special meeting. Eggie reported that the petitioners claimed that the Union gave false information about the strike. Collins tried to "present [his] case" that the union leadership was lying to the members when they said the workers were on a non-economic strike and could not be permanently replaced. (Collins Dep. 83.)[5] Mike Eggie responded to Collins' attack by saying that the members were not being permanently replaced (*id*. at 84), and Collins was shouted down as a liar (*id*. at 50; Joe Mitchell Dep. 95-96).[6] Plaintiffs deny that Collins and the other petitioners were given a fair opportunity to speak or that the Union allowed the membership to be informed of Collins' position. The meeting was "hectic," "chaotic," "heated," "noisy," and "there was a lot of yelling and cussing and screaming." (Doc. 28 ¶ 12, citing deposition excerpts.) Plaintiff Logan also addressed the committee at the meeting and told them that the NLRB felt they were in an

---

[5] Excerpts of the deposition transcript of Joseph Collins are filed at Doc. 29 Ex. 5.

[6] Excerpts of the deposition of Joe Mitchell are filed at Doc. 29 Ex. 2.

economic strike and could be permanently replaced. Logan testified that the Union leaders allowed him to be booed to the point that he felt he "was being railroaded." (Logan Dep. 54-55, 60.)[7] Three other strikers also stood up at the meeting and voiced their opinions and received similar treatment. Finally, a member moved to "bring back" Cognis' February 4 offer; the members voted and the motion to bring back Cognis' offer failed.

Five days after the April 6 meeting, Eggie wrote to the members that Kircher had assured the members "that the evidence against Cognis Corporation will overwhelmingly prove that their intent was to break the Union. . . ." (Doc. 29 Ex. 28.) In communications with the membership in June 2005, Eggie described the case against Cognis as "rock solid" and "almost a no brainer." (Doc. 29 Ex. 29.) With respect to the special meeting, Eggie stated in his letter to the membership:

> The small group of people who called for the special meeting had their request satisfied. They were able to voice their concerns, have their questions answered, and make and vote on a motion related to the company's last best and final. That motion was overwhelmingly defeated and no one contested the results at the meeting, which was within their rights. . . . We must stay together to be successful.

(Doc. 29 Ex. 28.)

Defendants state that the rules governing strikes and permanent replacements, and the risks associated with strikes, were commonly known. (Doc. 19 ¶ 16, citing deposition excerpts). Plaintiffs deny this and state that the Union told them that under the law they could not be permanently replaced. (Doc. 28 ¶ 15, citing deposition excerpts.) Plaintiff Gary Meeks testified that, although no one told him the strike would be risk free, Eggie told them that they could not be replaced and that he believed that to be true until he was notified that strike benefits had been

---

[7] Excerpts of the deposition of James Logan are filed at Doc. 29 Ex. 4 and Doc. 18 Ex. 52.

terminated.  (G. Meeks Dep. 38-39.)[8]

On April 18, 2005, Hearing Officer James Bubutiev of the Ohio Department of Job and Family Services conducted a hearing on unemployment benefits claims filed by 161 Cognis strikers, including 78 Plaintiffs.  At the hearing, which was open to the public, Cognis official Richard Wagner testified that Cognis began hiring permanent replacements in the third week of February and had hired 158 permanent replacements.

On May 3, 2005, the hearing officer ruled that the strikers were entitled to unemployment benefits because "Cognis ended the employer-employee relationship with the members of Local 14340 by permanently replacing them beginning February 23, 2005, and thereby severed the labor dispute as the proximate cause of unemployment."  (Doc. 29 Ex. 32.)  Following the hearing officer's decision, Eggie reported the following to the membership: "The unemployment hearing went well. [T]he company admitted under oath that they have hired 157 new employees and that they consider them to be permanent.  While this may scare you all a little bit it is very good for us for the purpose of unemployment . . . .  As far as the Unfair Labor Practice charge goes, it is a completely separate [sic] entity."  (Doc. 29 Ex. 33.)  When the unemployment benefits were awarded, Eggie again assured the members that these benefits had no bearing on whether the strikers had a right to their jobs when the strike ended:

> I want to clear up a few misconceptions about unemployment.  Just because we are approved for unemployment does not mean we no longer have a job.  The unemployment hearing officer simply ruled that Cognis had changed the "status quo" when they began hiring replacement workers.  He did not rule that these replacements had the right to keep our jobs permanently but that they were currently in our jobs and this is what is now causing our unemployment. . . .
>
> Also remember that unemployment and the National Labor Relations Board are 2 separate entities.  What happens with one does not affect the other.  When we win the unfair labor practice

---

[8]  Excerpts of the deposition of Gary Meeks are filed at Doc. 29 Ex. 20.

> charge with the NLRB it will make it absolutely illegal for Cognis
> to keep any of the scabs without bringing 1 of us back to work.

(Doc. 29 Ex. 34.)

Between April and June 2005, the International USW filed four separate but similar ULP charges accusing Cognis of violating NLRA sections 8(a)(1) and (5) by, among other things, surface bargaining and failing to bargain in good faith. The USW withdrew the first and third charges. Region 9 of the NLRB dismissed the second charge on July 5, 2005, and the USW did not file an appeal. The fourth and last charge, filed on June 29, 2005, was dismissed on August 31, 2005 and subsequently appealed to the General Counsel. The appeal was denied by the NLRB on October 28, 2005.

Eggie recognized that the General Counsel's rejection of the appeal effectively meant that the Union would not be able to convince the NLRB that the strike was over unfair labor practices. (Eggie Dep. 108.)[9] However, Eggie did not communicate this adverse decision in his letter to the membership dated October 29, 2005, nor is there evidence that he communicated the decision to the membership at the November or December 2005 monthly meetings or in any contemporaneous email. None of the Plaintiffs testified that the Union informed them about the dismissal of the last Union charge. Rather, Plaintiffs testified that the members were told that the charges were "still in the works," and they do not recall Eggie reporting that all of the charges filed by the Union had been withdrawn or dismissed. International UAW representative McLean testified that the Union did not tell the membership that the dismissal meant their hopes of being considered ULP strikers "was over as far as a legal issue." (McLean Dep. 159.)[10] Plaintiff Meeks testified that the Union never explained that the dismissal of the charges meant that the members were considered economic strikers who could be permanently replaced. (J.

---

[9] Excerpts of the deposition transcript of Michael Eggie are filed at Doc. 29 Ex. 6.

[10] Excerpts of the deposition transcript of Dave McLean are filed at Doc. 29 Ex. 7.

Meeks Dep. 125.)[11]

Striker Collins became a crossover in April 2005. On July 29, 2005, Collins filed a ULP charge against the Union alleging that the Union had breached its duty of fair representation by stating that the employees who went on strike could not be permanently replaced. NLRB Region 9 dismissed Collins' charge on September 1, 2005, finding that the Union may have "mistakenly advised employees that the strike would be deemed to be an unfair labor practice strike" and that it could not be established that the Union's conduct was "so arbitrary, discriminatory, or in bad faith" as to establish a violation of the NLRA. (Doc. 18 Ex. 32.)

Eggie reported the NLRB's decision on Collins' charge to the membership in a letter dated October 29, 2005. (Doc. 29 Ex. 45.) Eggie stated that the General Counsel had concluded that Collins' charge had no merit. (*Id*.) Further, Eggie's letter stated:

> The Union had suspicions that Joe Collins was working in concert with Cognis to try to break our Union, but now we have proof. I hope that he gets the message that this Union will not be broken! We may have had some misguided former members who were foolish enough to cross the picket line for the fast buck, but we will be victorious in the end and those fools who crossed will be left with only the shame that was once their dignity.

(*Id*.)

Plaintiffs testified that the Union continued to guarantee victory to the strikers and never advised them that they were economic strikers and that Cognis had lawfully hired permanent replacements. (Doc. 28 ¶ 26 citing deposition excerpts.) Eggie continued to send emails and letters to the strikers encouraging them to "do what is needed to win this strike" and disparaging the workers who had crossed the picket line. (Doc. 29 Ex. 46 (email dated 9/04/05), Ex. 47 (email dated 12/01/05), Ex. 48 (letter dated 1/05/06), Ex. 49 (email dated 2/26/06).) On December 1, 2005, Eggie wrote to the strikers that "If we continue with our strategy, we will be

---

[11] Excerpts of the deposition of Jeff Meeks are filed at Doc. 29 Ex. 16.

victorious, it is only a matter of time now!" (Doc. 29 Ex. 47.) According to Plaintiffs, continuing the strike after the October 28, 2005 dismissal of the Union's ULP charge against Cognis made no sense, but the Union failed to explain this to the membership.

On June 14, 2006, a replacement worker at Cognis filed a petition seeking an NLRB election to decertify USW. Only employees in the plant, not the strikers, could vote. Eggie notified the membership of the upcoming decertification vote and advised them that the vote "really does not have any bearing on the strike or the striking workers." (Doc. 29 Ex. 51.) The NLRB conducted the election on August 11, 2006, and the USW was decertified by a vote of 128 to 63. The NLRB issued a decertification order on August 30, 2006. Defendants assert that the strikers understood that the decertification vote meant that the union was "busted" and that the strike was lost. (Doc. 19 ¶ 27.) Plaintiffs deny this and assert that the strikers believed that the vote would not hurt the membership, based on Eggie's representation that it was "the scabs that will suffer the most from a decertification, not us." (Doc. 29 Ex. 53.) In a letter to local membership dated September 6, 2006, USW subdistrict director Dave McLean confirmed that the decertification vote was final. (Doc. 29 Ex. 61.) The letter explained that the members no longer had "the protections under the National Labor Relations Act to picket or walk picket at the site." (*Id.*) However, the letter affirmed the USW's continued support for the strikers and encouraged the members to continue to fight the labor dispute notwithstanding the decertification: "Director Dave McCall has assured me, along with your Committee that the USW will continue to assist you and local 14340 in everyway [sic] possible for as long as this fight continues." (*Id.*)

Plaintiffs claim that in early December 2006, Eggie and McLean were still telling them that they were still involved in a non-economic strike. (Doc. 28, Disputed Issues ¶ 83 citing deposition excerpts.) Then, at a December 13, 2006 meeting, McLean announced that financial

strike assistance to the Local would end. McLean recommended that strikers make unconditional offers to return to Cognis. When McLean told the members that strike assistance was being terminated, Plaintiff Mark Kennedy stood up and told him that "he had lied to the members of Local 14340, when he told them they could not be permanently replaced." (Dec. 13, 2006 meeting minutes, Doc. 29 Ex. 64.) Much yelling took place at the meeting, and Plaintiff Wade Sexton told McLean "the members were told this was a non-economic strike and that the company could not hire replacements." (*Id.*) Mike Eggie's response was that the strikers' "only option" was to sign the return-to-work letter drafted by the Union, and that this would put the strikers on a preferential hiring list. (*Id.*) Approximately seventy-three members, including fifty-six Plaintiffs, signed unconditional offers. A year later, eighteen replaced strikers had been recalled and had returned to work at Cognis.

Plaintiffs contend that it was not until the December 13, 2006 meeting that they realized the Unions had misrepresented them. (*Id.* ¶ 85.) Plaintiffs filed this lawsuit on March 6, 2007.

## LEGAL STANDARD

Defendants caption their motion as one for dismissal and for summary judgment on the six-months limitations period. Because both parties presented matters outside the pleadings, the Court will treat the motion as arising under Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. 12(b); *Granger v. Marek*, 583 F.2d 781, 785 (6th Cir. 1978).[12]

---

[12] Pursuant to Fed. R. Civ. P. 12(d), "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Plaintiffs in this case had reasonable opportunity to present material pertinent to Defendants' motion and, in fact, did so when they attached to their responsive memorandum numerous exhibits including an affidavit. (Doc. 29 exs. 1-67.) As such, the Court is required to proceed under Rule 56. *See, e.g., Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 392-93 (6th Cir. 1975) (finding that if affidavits are filed with the district court, the court must proceed under Rule 56 unless the court decides to exclude the affidavits).

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

**ANALYSIS**

Plaintiffs' sole claim is for breach of duty of fair representation brought against the Union. Plaintiffs do not bring a claim against their former employer, Cognis. The Union argues that the six-months limitations period from § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), which applies to charges of an unfair labor practice filed with the NLRB, applies to Plaintiffs' claim. Before applying the law to the facts of this matter, the Court will discuss the origin of the application of a six-months limitations period to breach of duty of fair

representation claims.

Ordinarily, before an employee may bring suit against an employer for breach of a collective bargaining agreement, the employee is required to attempt to exhaust any grievance remedies provided in the collective bargaining agreement. *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 164 (1983). However, in cases where the union representing the employee in the grievance procedure breaches its duty of fair representation, the general rule "works an unacceptable injustice." *Id*. at 165. In such instances, an employee may bring suit against both the employer and the union in what is referred to as a "hybrid § 301/fair representation claim," the suit against the employer resting on § 301 of the National Labor Relations Act, 29 U.S.C. § 185, and the suit against the union resting on the duty of fair representation that is implied under the scheme of the Act. *Id*. at n.14.

It was in the context of a hybrid § 301 action that the United States Supreme Court established a six-months limitations period for an employee's breach of duty of fair representation claim against his union. *Id.* at 155. In *DelCostello*, the Supreme Court established this limitations period by "borrowing" that limitations period from § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), applicable by its terms only to charges of an unfair labor practice filed with the National Labor Relations Board. *Id*.

Typically, federal courts borrow state-law civil limitations periods to govern federal claims for which there is no statutory limitations period. *Id*. at 158. The Supreme Court in *DelCostello* considered this option and analogized unfair representation claims to state attorney malpractice claims, which typically have two- to six-years statutes of limitations. *Id*. at 167. However, the Court decided that such a limitations period would be unsatisfactory. Rather, the Court concluded, the limitations period set forth in § 10(b) of the NLRA was appropriate to claims alleging unfair representation because (1) "there is a substantial overlap" between unfair

labor practices and breaches of a union's duty of fair representation and (2) the need for uniformity among procedures followed for similar claims. *Id*. at 170-71.

The Supreme Court's decision in *DelCostello* established that the six-months limitations period of § 10(b) applied to hybrid § 301/unfair representation claims, but it did not address the question of whether the six-months limitation period would apply to an unfair representation claim that was not brought in conjunction with a claim against the employer under § 301. The Sixth Circuit answered that question when considering the application of *DelCostello* to a series of hybrid claims. *Adkins v. Int'l Union of Elec. Radio & Mach. Workers, AFL-CIO-CLC*, 769 F.2d 330 (6th Cir. 1985). Although all of the claims in *Adkins* were hybrid claims, the court undertook to decide that § 10(b) should be applied to all unfair representation claims "regardless of the nature *or presence* of the section 310 claim." *Id*. at 335 (emphasis added).

Since *DelCostello*, the Sixth Circuit has had the opportunity to consider the question of accrual in § 310 cases, reiterating the rule that the sixth-month time period under § 10(b) "accrues from the date that the plaintiff 'discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.'" *Taylor Warehouse Corp. v. Nat'l Labor Relations Bd.*, 98 F.3d 892, 899 (6th Cir. 1996) (quoting *Nida v. Plant Protection Assoc. Nat'l*, 7 F.3d 522, 525 (6th Cir. 1993)). In *Taylor Warehouse*, for example, the Sixth Circuit considered whether an unfair labor practice charge brought against an employer was time barred. 98 F.3d at 899. The court held that the § 10(b) period "begins to run at the time an employee receives unequivocal notice of an adverse employment action rather than the time that action becomes effective." *Id*. (quoting *Armco, Inc. v. NLRB*, 832 F.2d 357, 362 (6th Cir. 1987)).[13] The employer in *Taylor Warehouse* had announced well before the § 10(b) time period

---

[13] The defendant bears the burden of establishing that a charging party received unequivocal notice of the adverse employment action. *Taylor Warehouse*, 98 F.3d at 899.

that it intended to divert a specific type of work to non-union employees.  *Id*. at 899.  However, the court held that such notice was not "clear and unequivocal" when several union employees testified that they continued to perform such work even after the announcement.  *Id*. at 900.  The court concluded that the "mixed signals" by the employer could not be deemed clear notice of an adverse decision.  *Id.* at 899; *see also Nat'l Labor Relations Bd. v. Pub. Serv. Elec. and Gas Co.*, 157 F.3d 222, 227 (3d Cir. 1998) (joining several courts of appeals in applying the clear and unequivocal notice rule, namely that "[t]he 10(b) period begins when the victim of an unfair labor practice receives *unequivocal notice* of a final adverse decision.  Rumors or suspicions will not do. . . .")

In a case addressing the § 10(b) limitations period as applied to a hybrid § 301 action, the Sixth Circuit reiterated the rule that a claim under § 301 accrues "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation."  *Moore v. Local 598*, 33 F. App'x 165, 167 (6th Cir. 2002).  The *Moore* Court held that Moore's action, filed in October 1999, was time-barred because a reasonable person in Moore's position would have known when the union withdrew his grievance in October 1996 that he would have to take legal action to protect his rights.  The court clarified that the standard for determining the accrual date in a § 301 action is an objective one: "the asserted knowledge of the [plaintiff] is not determinative if [he] did not act as a reasonable [person] and, in effect, closed [his] eyes to evident and objective facts concerning the accrual of [his] right to sue."  *Id*. (quoting *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994)).  As the *Moore* court observed, "[t]he phrase 'withdrew the grievance' certainly should have put a reasonable person on notice that he would have to take legal action to protect his rights."  *Id*.

In another hybrid § 301 action, the Sixth Circuit found that the plaintiffs' claims were time barred because plaintiffs knew of union misconduct more than six months before they filed

suit.  *Garrish v. Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am.*, 417 F.3d 590 (6th Cir. 2005).  In *Garrish*, the plaintiffs claimed that the union fraudulently extended a lawful strike to (1) obtain employment for two unskilled workers and (2) to obtain payoffs to the local's upper-level officials.  *Id*. at 592.  The plaintiffs filed their hybrid lawsuit on August 7, 2000.  With respect to the claim concerning the unlawful hiring, the Sixth Circuit determined that the statute of limitations period began to run in February 1999 when the plaintiffs' grievances were withdrawn.  *Id*. at 597.  With respect to the alleged payoff of union officials, the court found that the statute of limitations period began to run in September 1997 when the plaintiffs learned that the local's negotiators had abused their bargaining power so union officials would receive payoffs.  *Id*. at 597.  The court did not accept the plaintiffs' argument that the time period should not have begun until mid-2000 when they learned that *all* union committeemen received money at the end of the strike; rather, it was "paramount" that the plaintiffs knew as early as 1997 that some of the payoffs had occurred.  *Id*. at 598.

In a case with facts substantially analogous to those here, a district court within this Circuit held that the plaintiffs' breach of duty of fair representation claim against the union was not time barred because it was unclear that the plaintiffs knew or should have known that they lost their jobs permanently on the date the company replaced the striking workers.  *Fyffe v. Int'l United Auto., Aerospace & Agric. Implement Workers of Am.*, No. C86-2895, 1989 WL 149397 (N.D. Ohio Jan. 27, 1989).  In *Fyffe*, plaintiffs were members of the local auto workers union who went on strike on August 17, 1985.  *Id*. at *1.  On September 29, 1985, the plaintiffs received a letter from their employer notifying them that if they did not return to work by October 7, 1985, they would be permanently replaced.  *Id*.  Between October 1985 and May 1986, the union encouraged the plaintiffs to stay on strike and affirmed that they would return to work at the end of the strike.  *Id*.  The defendants knowingly failed to disclose to plaintiffs that

plaintiffs could be permanently replaced. *Id.* The defendants argued that the plaintiffs knew or should have known that they had lost their jobs on October 8, 1985 when they were replaced by new employees. *Id.* at *2. The plaintiffs argued that their July 11, 1986 filing was timely because the cause of action accrued on May 5, 1986 when union officials told the members that under the law they could be replaced, a fact not previously told to them. *Id.*

The *Fyffe* Court concluded that the earliest time the plaintiffs could have known that the union had made misrepresentations was when the officers told them for the first time that economic strikers were not protected under the law. *Id.* "It is not unreasonable for plaintiffs to believe that the union was supporting them and that they would get their jobs back when the strike was over." *Id.*; *accord Causey v. Local 1323, United Auto., Aerospace and Agric. Implement Workers of Am.*, 734 F. Supp. 1201, 1205 (D.S.C. 1989) (denying defendant's motion to dismiss on limitations grounds and noting it was not unreasonable "for the plaintiffs to believe that the defendants were continuing to support them and that they would get their jobs back when the strike was over.")

The Court has undertaken this review of case law to demonstrate that circumstances triggering the statute of limitations can vary widely in unfair representation and unfair labor practice cases. For example, a specific event that would lead a reasonable person to discover "the acts constituting the alleged violation" in an unfair representation claim would be the person's discovery that his union had withdrawn his grievance, as in *Moore*, 33 F. App'x 165, and *Garrish*, 417 F.3d 590. On the other hand, some cases involve situations where there is conflicting information from sources upon which a worker might reasonably rely, such as the "mixed signals" conveyed by the employer in *Taylor Warehouse Corp.*, 98 F.3d 892, and the union in *Fyffe*, 1989 WL 149397. In these cases, fact disputes may preclude a court from deciding when reasonable persons would have known that they needed to take action to protect

their legal rights.

In their motion for summary judgment, Defendants argue that even under Plaintiffs' version of the facts, their claim is time barred. Plaintiffs admit that by March 2005, they heard accusations that union leaders were lying about the status of the strike and permanent replacements. The accusations were made in 2005 in meetings, on the picket line, and in Collins' ULP charge alleging breach of duty of fair representation. According to the Defendants, when the accusations of union lying began, the limitations period began.

Defendants primarily rely on *Garrish* as supporting their argument. *Garrish*, Defendants argue, holds that once a potential plaintiff is "exposed" to or is "familiar" with or has "knowledge" of "allegations" of wrongdoing, the potential plaintiff has six months to sue. The Court disagrees with this reading of *Garrish*. The Sixth Circuit noted in *Garrish* that "[a]llegations of payoffs and strike prolongation began immediately after the 1997 strike ended." 417 F.3d at 597. However, the Court does not read the opinion as holding that knowledge of the allegations alone was sufficient to start the clock running. Rather, the Sixth Circuit specified that the record disclosed that Plaintiff Garrish "*knew* in July 1997 that two union officials . . . had 'receiv[ed] substantial money grievance settlements'" and that Plaintiff Austin "agreed during his deposition testimony that *he learned* in September 1997 that Local 594's negotiators had abused their bargaining power to get large payments [for high-level union officials]." *Id.* (emphasis added). While knowledge of allegations of wrongdoing certainly is a factor in the analysis of whether a plaintiff objectively should have discovered the acts giving rise to the cause of action, knowledge of allegations alone is not dispositive. Furthermore, the Court does not find anything in *Garrish* that overrules the Sixth Circuit's holding in *Taylor Warehouse* that the § 10(b) period "begins to run at the time an employee receives unequivocal notice" of the acts constituting the alleged violation. 98 F.3d 892.

Applying the guidance of both *Garrish* and *Taylor Warehouse*, the Court must focus on what the Plaintiffs knew and when they knew it. Plaintiffs' claim of unfair representation rests on the premise that they believed they were on a noneconomic strike and could not be permanently replaced. Thus, as in *Fyffe* and *Causey*, the "knowledge" that the Plaintiffs needed in order to trigger the limitations period was that they were, in fact, economic strikers that could be replaced. *Fyffe*, 1989 WL 149397 at *2 ("The earliest they could have known that the union had made misrepresentations was when the officers told them for the first time that under the law economic strikers are not protected."); *Causey*, 734 F. Supp. at 1205 (finding that the plaintiffs' cause of action arose the date the strike ended "and the date that the 'guarantee' that they could return to their jobs was not fulfilled.")

Plaintiff Logan went to the NLRB in March 2005 and learned that the strike was an economic strike and that the strikers could be permanently replaced. At that time, Logan concluded that the Union was mishandling the strike. (Logan Dep. 77.) Logan's testimony demonstrates that his unfair representation claim accrued in March 2005. Accordingly, his claim asserted in this action is time barred.[14]

Unlike Logan, other Plaintiffs testified that they did not know that the Union was mishandling the strike and that they would not get their jobs back until December 2006 when their strike assistance was terminated. Although Plaintiffs Arns, Sadler, and Nichols signed Collins' March 2005 petition requesting a special meeting, none of these Plaintiffs testified that they signed the petition because they knew that the Union was being untruthful on the issue of whether they could be permanently replaced. Sadler testified that he did not read the petition before he signed it (Sadler Dep. 29),[15] and Arns testified that he signed the petition because he

---

[14] Although Logan did not believe the union was representing his interests, he did not cross the picket line; following the April 6 meeting, Logan retired. (Logan Dep. 79.)

[15] Excerpts of the deposition of Chester Sadler are filed at Doc. 18 Ex. 57.

wanted his job back and wanted the meeting to "rediscuss the contract and demand another vote." (Arns Dep. 17.)

Arns' testimony requires the closest scrutiny of any of the Plaintiffs: he testified that at the time he signed the petition, he had "suspicions" that Eggie might have been lying. (*Id*. at 73.) However, also Arns testified that the Union's attorney, Kircher, assured members at the April meeting that the strike was noneconomic and that they would win. (*Id*. at 57.) Arns believed the disagreement over whether it was an economic strike or a noneconomic strike represented "two opposing viewpoints" or "two sides with different arguments." (*Id*. at 34, 78.) On balance, the evidence is insufficient to establish that Arns had "unequivocal notice" that he would have to take legal action to protect his rights at the time he signed Collins' petition. *See Moore*, 33 F. App'x at 167.

The Court is mindful that "the determination of the accrual date is an objective one: 'the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue.'" *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000 (6th Cir. 1994) (quoting *Chrysler Workers Ass'n v. Chrysler Corp.*, 834 F.2d 573, 579 (6th Cir. 1987)). Thus, even if Plaintiffs did not have actual knowledge of Defendants' acts that gave rise to their claims, they will be charged with the knowledge if they did not act as reasonable persons would have.

Defendants argue that this is the case here: because Plaintiffs were "exposed" to Collins' and others' accusations at the April 6, 2005 special meeting, they knew or should have known that the Union was engaging in misconduct. Defendants also say that Plaintiffs' argument that the Union concealed information from them is unsupportable, accusing the Plaintiffs of "self-indulgent lack of diligence" and stating that "any diligent member merely had to ask for more

information from the union." (Doc. 44 at 13-14.) According to Defendants, Plaintiff Logan did what any reasonable Plaintiff would have done: he went to the NLRB and concluded that the Union mislead the members.

Construing the evidence in a light most favorable to the non-moving party, the Court does not find that Plaintiffs acted unreasonably in believing that the Union continued to represent their interests until they were told that strike assistance was being terminated and that they should sign an unconditional return-to-work letter. Communications from Eggie and McLean consistently assured the strikers victory. These communications continued in written form until at least September 6, 2006[16] and orally until at least November 8, 2006.[17]

While it may have been reasonable for Collins[18] and Logan to go to the NLRB to find out more information on the meaning of economic strikes and whether their union representatives were misleading them, it is far from certain that it was *unreasonable* for other strikers to discredit the information Collins and Logan tried to communicate to them. First, the Union leaders refused to meaningfully respond to the accusations that they were lying, and they allowed Collins and Logan to be shouted down as liars. Second, Collins' unfair labor practice charge against the Union was denied, and the Union representatives used this information to prove to the membership that Collins was wrong and was himself a liar. Third, while approximately sixty crossovers, or 23% of the workforce, chose to abandon the strike by May

---

[16] USW Sub-District Director McLean wrote a letter September 6, 2006 that read, "Director Dave McCall has assured me, along with your Committee that the USW will continue to assist you and local 14340 in everyway [sic] possible for as long as this fight continues." (Doc. 29 Ex. 61.)

[17] Local 14340 meeting minutes dated November 8, 2006 show that McLean "said we still have a labor dispute and should start seeing some activity in the near future." (Doc. 29 Ex. 63.)

[18] Unlike many of the strikers, Collins did not have a long history of working at Cognis, and he did not have family members in the union. (Collins dep. 126.) Thus, he did not view the union leaders with the same sense of trust that many of the strikers did.

2005, the vast majority of strikers continued to stick with the strike, working picket lines and attending monthly meetings in hopes that their Union would deliver on their assurances that they would ultimately succeed in their labor dispute with Cognis.

Fourth, and perhaps most important, the culture among the membership required fidelity to and reliance on the Union. (*See*, *e.g.*, Scott Kennedy Dep. 36, 71 ("As long as they were supporting me, I believed we were going to go back to work. They believed in it, I believed in them."; "I believed in the union. I believed they were going to back us to the bitter end, which they had stated on numerous occasions."). When asked why he thought the membership did not believe his opinion that the Union was mishandling the strike, Logan testified that "our people truly believe in the leadership, and whatever the leadership told them was–was gospel. So no matter what I done or Joe Collins done or somebody else done, if ten more people would have done it, they wouldn't have believed it, because they truly believed in the leadership." (Logan Dep. 71.)[19] Furthermore, as Plaintiff Gary Meeks testified, the Union representatives were more convincing than Collins because Collins was just a "lay person" whereas Union representatives like Dave McLean were educated individuals well-versed on union matters. (Gary Meeks Dep. 55-56.) Given this type of testimony, the Court cannot conclude that the evidence is so one-sided that Defendants must prevail as a matter of law on the issue of whether the statute of

---

[19] Collins explained the members' allegiance to the union in this way:

> [A] lot of guys in the union have high school educations. . . they came out of—you know, with no educations . . . making that kind of money. . . . Andy Mozzone was union president for years, man, and he would have never allowed this to happen. . . . He looked out for everybody down there.
> This guy [Mike Eggie] wasn't looking out for their best interest. . . but they thought he was following in the same footsteps as [Mozzone]. These guys were just believing everything that he was telling them. You know, when you don't have education, you know, you just rely on people like that."

Collins Dep. 94-95.

limitations bars Plaintiffs' lawsuit.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment addressing the six-month limitations period (doc. 21) is GRANTED as to Plaintiff Logan and DENIED as to all other Plaintiffs.


IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court